288 So.2d 180

**Butchie McBRIDE and McArthur Ligon**

v.

**STATE.**

**4 Div. 246.**

Court of Criminal Appeals of Alabama.

Jan. 2, 1974.

John B. Crawley, Troy, for appellants.

William J. Baxley, Atty. Gen., and Otis J. Goodwyn, Asst. Atty. Gen., for the State.

LEIGH M. CLARK, Supernumerary Circuit Judge.

Each of the appellants was found guilty by a jury of grand larceny and sentenced by the court to imprisonment in the penitentiary for a term of three years. They were separately indicted for the same offense, but with their consent they were tried jointly. The appeal is before us on a joint record containing a joint certified transcript of the testimony, the attorney for appellants-defendants having agreed that "only one transcript will be necessary."

The property involved was a pistol of the alleged value of $45.00 and allegedly was personal property of Exie Cooper.

The only action of the trial court that is called in question by appellants on this appeal was in overruling the objection of defendant McBride to a statement made by him, in the presence of defendant Ligon, to Pike County law enforcement officers. The court sustained the objection of defendant Ligon. In admitting the statement in evidence as to McBride, the court explained to the jury in part as follows:

"... . I have overruled the objection as to McBride and that's before you. But I sustained the Defendant's objection as to [L]igon. That's not evidence before you. I'm limiting it only to the statements made by McBride, that he knew where the gun was and he would go get it. I'm holding that's not admissable [sic] against Ligon, but is against McBride. ..."

A large part of the testimony upon the trial was out of the presence of the jury and was in connection with the question of whether the statement of McBride was admissible. The evidence as a whole was brief. The only evidence of eyewitnesses as to what took place at the time and place of the alleged crime consisted of the testimony of Exie Cooper and James Boyd, his brother-in-law, on behalf of the State, and the testimony of Ezippi Youngblood, a witness on behalf of defendants. There was some difference between the testimony of the witnesses for the State and the witness for defendants, particularly as to whether Cooper had brandished or drawn the pistol involved, or otherwise had taken provocative action against one or both of the defendants, but they were in agreement in testifying that the pistol was taken away from Cooper by McBride, that Ligon, with knife in hand, took part in the encounter, that McBride walked out of the place with the pistol and Cooper walked out and called the police. The witness who testified on behalf of defendants testified that Ligon told McBride to get the pistol.

In contending that the statement of McBride was not admissible in evidence, appellants rely upon Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There seems to be no issue on this appeal as to whether the *Miranda* warnings were given. Defendant McBride denied on the trial that they were given, but there was abundant evidence that they were all timely given in detail by one or more of the officers. The issue between the parties on this appeal is as to whether there was a valid (a knowing, voluntary and intelligent) waiver of the constitutional privilege against self-incrimination and the right to counsel. Governed by Dotson v. State, 288 Ala. 727, 265 So.2d 162, we conclude that an express statement by the accused to the effect that he is willing to make a statement and does not want an attorney is not a prerequisite to the admission in evidence of an in-custody statement. As stated in *Dotson*,

"... . The ultimate test is whether the waiver of the right to silence and to counsel was knowingly, voluntarily and intelligently made. This determination can be deduced from the particular facts and circumstances of each case and need not be determined solely upon the presence or absence of an express statement of certain words. As was said in United States v. Hayes, 385 F.2d 375 (4 Cir., 1967); cert. den., 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968):

'Appellant is correct in his position that a heavy burden rests upon the government to prove that a person in custody 'knowingly and intelligently waives his privilege against self-incrimination and his right to retained or appointed counsel.' Miranda v. State of Arizona, supra, 384 U.S. at 475, 86 S.Ct. at 1628. However, he is inaccurate when he contends that

federal courts apply a talismanic approach in determining whether this burden has been satisfied. Just as the mere signing of a boiler-plate statement to the effect that a defendant is knowingly waiving his rights will not discharge the government's burden, so the mere absence of such a statement will not preclude as a matter of law the possibility of an effective waiver.'

\*     \*     \*     \*     \*     \*

" 'Thus, we cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof.' "

The circumstances as to the making of the statement, to which objection was made, were extraordinary. The statement was made on Monday morning, the day following the taking out of the warrant. On the preliminary question as to the admissibility of the statement, McBride was asked by counsel for the State on cross-examination as to how McBride happened to be in the sheriff's office that day, and McBride replied:

"Well, the morning we went down there, Mr. Leon came by the house that Sunday morning and told us that Cooper had— was going to sign a warrant on us if we didn't give him the pistol. And he say, 'Carry it on down and give it to the Sheriff.' And I came on down to the court house. Mr. Davis' car wasn't hear [sic] at the time. I came on back; and, that morning, we ran up on Leon again; and then, we came on down Monday morning about nine o'clock. And we got down there about nine o'clock, and we stayed, I reckon, until about ten. Mr. Davis hadn't came in there. So, we came back around to Love Street, down —We met Officer Hamp there; so, we waved him down and asked him where Mr. Davis was. And he said, 'He will be in, in a few minutes.' And we get in the car with him and ride back around there. And we ride back and sit around here until it was around about eleven o'clock. And Mr. Davis came in with another prisinor [sic] from somewhere —Luverne, I think—and Mr. Davis then —They talked with him a long time and we was sitting there. And so, after then, I went out and Ligon was still in there. So, when I came back in, Mr. Davis was talking with Ligon. So, he asked me about the gun. So, I told him how we got the gun. And I asked him, 'What did the feller say?' And he said that the feller signed a warrant against me for robbing him. And I told him I hadn't robbed him. And I asked Mr. Davis, 'Could we see the warrant?' And he said it was around in the Judges —Probate Judge—Not probate. I mean —I forgot the name of the place down there. Anyhow Mr. Robert Newman's office. Anyway, that's where it's at. I know the name, Mr. Robert Newman. And he said we was under arrest for robbery. And he asked who had the gun. And I told him that I had the gun. So, me and—So, he said, 'You will have to go and look [sic] them up.' And I told Thomas that I might as well pick up the gun now. So, I went around to my sister's where I left the gun. And my brother-in-law, he had carried it to his house. So, I went around there to my house and picked up the gun and gave it to Officer Hamp, and he brung me back and locked me up."

Further light upon the unusual circumstances as to the making of this statement by McBride that he knew where the gun was and he would go get it is to be ob-

tained by reference to testimony of Hamp Thomas upon being cross-examined by defendant's counsel out of the presence of the jury as follows:

"Q. Immediately after you gave this Meranda [sic] warning to these two defendants, what did they say?

"A. McBride said that he knew where the gun was; and said, 'I'm going to take you to get it over at Steal's house. And we went to James Steal's house, and I got the gun, and it was the wrong one. And McBride said, 'This is the wrong pistol.' Says, 'I have the right gun at my house.' "

· The testimony of Sheriff Davis out of the presence of the jury sheds additional light upon the question of whether McBride waived his privilege against self-incrimination and his right to counsel. After testifying in detail as to giving the warnings while sitting in his office, Sheriff Davis said:

". . . And then, I told them if they would like to talk, I would like to talk to them about it, and Butchie told what happened, and told me that he had the gun and they were going to get it."

Taking into consideration the above-quoted portions of the testimony and all of the other circumstances as shown by the record, it is our view that the sum total of the circumstances is sufficient to show that McBride knowingly, voluntarily, and intelligently waived his privilege against self-incrimination and his right to counsel.

■ As an additional reason for upholding the ruling of the trial court, we are of the opinion that the circumstances as a whole affirmatively disclose the voluntariness and the volunteeredness of the statement, which circumstances included the following: defendants went voluntarily to the sheriff's office to inquire, that is, to interrogate; at the time of the commence-

ment of the discussion in which the statement was made, neither defendant was under arrest; there was some evidence that neither had been arrested at the time of the statement; they were not grilled; they were not intensively interrogated; they took affirmative action in seeking out the sheriff or other officers to discuss the matter, and not being able to obtain an audience upon their arrival at the sheriff's office, they waited for a while, then left and after considerable time voluntarily returned. The mere fact that they were in the sheriff's office does not in and of itself require the conclusion that the statement was involuntary when surrounded by all of the circumstances that here show the contrary. In line with the reasons for this view is what was stated in Ison v. State, 281 Ala. 189, 200 So.2d 511, as follows:

"The Court of Appeals based its reversal of the judgment on the insufficiency ·of the predicate for the admission of an inculpatory statement made by the defendant to M. E. Bailey, a police officer of the City of Montgomery.

"The testimony of Officer Bailey as to the circumstances of the making of the statement is in no wise contradicted by any evidence presented below, including that of the defendant.

"[1] Where there is no dispute about the facts, we may examine the record for a more complete understanding of those facets of the record treated in the opinion of the Court of Appeals. Johnson v. State, 277 Ala. 655, 173 So.2d 824, and cases therein cited.

"Officer Bailey, to whom the inculpatory statement was made, testified that he and his partner, Officer W. C. Brown, drove to the scene of the shooting. They stopped behind a car. 'Inside of the car there was a person who was slumped over and had been shot in the head. I attempted to stop the bleeding, and he called on the radio to send an

ambulance and a detective unit. And while I was with the person who was in the car, Mr. Ison came out of his house.'

"It would appear that the reasonable inference to be drawn from Bailey's above testimony is that he went to the automobile in which the deceased was lying, while Officer Brown was contacting the police headquarters over the police car radio.

"As the excerpt of the record set forth in the opinion of the Court of Appeals shows, the defendant approached Officer Bailey with a pistol in his hand, and in response to Bailey's question if he had done the shooting, made the inculpatory statement that he had shot the deceased.

"While it is true that the District Attorney did, in one question, ask Bailey if Ison's approach to him, and his reply, were made right after '*you all* had gotten to the scene.' (Emphasis ours.) We do not think that this isolated question and answer indicates anything more than that the contact between Bailey and Ison took place very shortly after the arrival of Bailey and Brown at the scene of the shooting. It does not indicate that Brown was present at this time, particularly in view of Bailey's testimony as to the circumstances. The remaining questions by the District Attorney, as set forth by the Court of Appeals, show that the District Attorney so understood the situation as evidenced by his repeated use of the word 'you,' rather than 'you all,' in all other instances.

"[2] As repeatedly stated in the opinions of this court and of the Court of Appeals, prima facie a confession is presumed to be involuntary, and there must be evidence addressed to the trial judge sufficient to rebut this presumption and showing that the confession was made without the influence of either hope or fear, *unless the attending circumstances affirmatively disclose the voluntariness of the confession.* Rudolph v. State, 275 Ala. 115, 152 So.2d 662, cert. den. 375

U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119; . . . Peoples v. State, 256 Ala. 612, 56 So.2d 665.

"As aptly stated by Judge McElroy in his work 'Law of Evidence in Alabama,' 2d Ed. Vol. II, Sec. 200.13(5), p. 109:

"'A formal predicate is not necessary (though as a matter of caution it is always advisable) when the circumstances testified to, 'affirmatively show' no improper inducements, that is, when the circumstances indicate pretty clearly that, according to the common probabilities of experience, the confession was not improperly induced.'

"[3] We conceive of no set of circumstances where it could be more unlikely that a statement by a person was coerced, than in the present situation where that person left his home, approached an investigating officer, and while standing in his own yard with a pistol in his hand, and not yet even in custody, replied to a question by the officer then engaged in ministering to a wounded man, as to whether he had shot the victim.

"As stated in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694:

"'The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation *while in custody at the station or otherwise deprived of his freedom of action in any way.*' (Italics ours.)

\*      \*      \*      \*      \*      \*

"'General-on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. *In such situ-*

*ations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.'* (Italics ours.)

\* \* \* \* \* \*

" 'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' "

The statement just quoted from *Miranda* that volunteered statements are not barred by the Fifth Amendment and their admissibility is not affected by the holding in that case is itself an inhibition against our attempting to apply *Miranda* to that which *Miranda* has expressly excluded. There is some indication in the evidence that the statement of McBride was made in response to a specific question. On the other hand there is much in the evidence to indicate that the statement was not asked for, that it was without solicitation, as well as without a particle of compulsion or coercion.

It should be stated also that the substance of the testimony admitted in evidence against McBride after objection by defendants, that McBride said he "knew where the gun was and he would go get it" was in evidence prior to any objections on behalf of defendants. This was in the testimony of Hamp Thomas as follows:

"Q You brought that pistol up here today?

"A Yes, sir.

"Q From whom did you get that pistol?

"A Buchie McBride.

"Q Buchie McBride? When did you get it?

"A Buchie McBride and Mack came up to the sheriff's office, and I asked them where the pistol was. So Butchie told me that James Steal had the pistol.

"Q Had they been arrested at that time?

"A No, sir."

At the time of such testimony, the particular pistol had been admitted in evidence. Exie Cooper had identified the pistol on redirect examination by the State and had testified that he had not seen the pistol since it was taken away from him the night of the alleged crime. On redirect examination, the pistol was shown Cooper by the State's attorney, identified by Cooper and admitted in evidence.

The record convinces us there was no violation of constitutional rights and that the trial court was not in error in overruling the objection of appellant McBride as to his statement.

We have considered the entire record, as required by Title 15, § 389, Code of Alabama 1940, and find no prejudicial error therein, and we conclude that the judgment of the trial court as to each appellant-defendant should be affirmed.

The foregoing opinion was prepared by Honorable LEIGH M. CLARK, Supernumerary Circuit Judge, serving as a Judge of this Court under § 2, Act No. 288, Acts of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of this Court.

The judgment is hereby

Affirmed.

All the judges concur.